FILED
APR 16 2010

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

LINDSAY HUNT,

                    Plaintiff,

        v.

CITY OF PORTLAND, an Oregon
municipal corporation; WILLIAM
HUBNER, an individual; JOSEPH
SCHILLING, an individual; ERIC
HENDRICKS, an individual; BRYAN
PARMAN, an individual; JUDY
BRUMFIELD, an individual; LESLIE
PINTARICH, an individual; and
QUENCY HO, an individual,

                    Defendants.

Case No.: 08-CV-802-AC

OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

### Findings and Recommendation

Plaintiff Lindsay K. Hunt ("Hunt"), filed this action against her former employer, the City

of Portland (the "City"), as well as various police officers, including William Hubner, Joseph

Schilling, Eric Hendricks, Bryan Parman, and Judy Brumfield (collectively "Defendants"). After

dismissing various claims against various defendants, the claims that remain, as set forth in the

Second Amended Complaint filed December 19, 2008, (the "Complaint"), are for retaliation based

on protected speech under state law, gender discrimination under state law, and deprivation of Hunt's

constitutional rights to free speech and equal protection under federal law. Currently before the court

is Defendants' motion for summary judgment on all remaining claims. For the reasons set forth

below, summary judgment on Hunt's retaliation claims based on OR. REV. STAT. 659A.203 and

659A.230 is denied, and summary judgment on Hunt's gender discrimination, free speech, and equal

protection claims is granted.

*Background*

The City hired Hunt as a police officer on July 27, 2006. (Hunt Dep. April 30, 2009 ("First

Hunt Dep.") 39:20-21.) On Hunt's first day, Officer Joe Schilling, co-coordinator of the Portland

Police Bureau's ("Bureau") field training and evaluation program, gave a speech to the newly sworn

officers about the performance expected of them as probationary officers. (Schilling Aff. ¶ 3, First

Hunt Dep. 43:2-8.) Officer Schilling started out by stating that "Joe Schilling has a job. You're

trying to keep a job." (Hubner Dep. 20:4-10.) He then explained that successful trainees are those

that follow directives and avoid standing on tables and waving flags. He stated that if your name is

not known or has not been heard by the training officers by the end of the training period, that is a

good thing. (Hubner Dep. 22:6-25.) The purpose of the speech was to encourage the probationary

officers to meet an expected standard of performance. (Schilling Dep. 38:22-23.) Hunt heard him

say "Do whatever your coach tells you; and if you don't like it, get through it. If you want to make

it to the next phase, you can be the kind of cop you want to after your probationary period." (First

Page 2 - OPINION AND ORDER                                    {SIB}

Hunt Dep. 43:23-44:2.)

Hunt progressed through basic academy, entry phase, and advanced academy virtually without incident. The only questionable conduct occurred when she and Officer Leslie Pintarich, her field training officer at the time, accepted free hot chocolate from a 7-Eleven. (First Hunt. Dep. 71:18-72:24.) Hunt explained that she tried to pay for the hot chocolate but that the male cashier continuously refused to take her money. After about five minutes, Officer Pintarich advised Hunt that they needed to leave. Officer Pintarich reminded Hunt that she had paid for her beverage every other night and that it was just 99 cents. (First Hunt. Dep. 71:18-72:24.) Hunt doesn't remember if she placed the money on the counter before she left. (First Hunt. Dep. 72:19-24.) Hunt later voiced her concern to Officer Pintarich that by failing to pay for the hot chocolate, the cashier might expect some special treatment in the future. (First Hunt. Dep. 72:1-8.)

During her training, Hunt became familiar with various City and Bureau policies, including the prohibition of discrimination and retaliation, and the procedures for reporting discriminatory or retaliatory conduct. She also received training on workplace harassment policies, ethics, policing and reporting generally inappropriate behavior, including the duty to report misconduct, and the need to promptly respond to requests for backup assistance from all of her colleagues. (Hunt Dep. July 9, 2009 ("Second Hunt Dep.") 12:18-23, 43:16-24, 76:18-20, Johnston Decl. Exh. 14.)

Hunt began her field training in late May 2006 and was assigned to work nights with Officer Quency Ho, a certified field training officer for the Bureau. During their four days working together, Officer Ho referred to Hunt as a "princess" at least once a shift and as a "girly girl" on at least one occasion. (First Hunt Dep. 128:21-130:20.) Hunt recalls Officer Ho saying that "it's a boys' world and I need to starting acting like a boy if I'm going to make it, and I need to be more aggressive and

Page 3 - OPINION AND ORDER                                                            {SIB}

play by the boys' rules." (First Hunt Dep. 127:14-19.) He also complained about having to drive, stating "I'm done with this crap. Princess wants to be chauffeured around all night." (First Hunt Dep. 133:11-12.) Officer Ho seemed more approachable by, and communicative with, male than female police trainees. (First Hunt Dep. 270:25-271:2.) Other police officers also used these names with regard to Hunt, stated that she thought she was too good to hang out with the "boys' club" and told her to "[s]top being a girly girl." (First Hunt Dep. 128:1-20, 129:20-24.)

While working with Officer Ho, Hunt became concerned about his conduct as a police officer. (First Hunt Dep. 184:11-25.) Hunt generally alleges[1] in the Complaint that Officer Ho ordered citizens to destroy deadly evidence, ordered Hunt to falsify police reports, used unauthorized, excessive, and unreasonable force on civilians, refused to fill out "use of force" reports, and took goods from a convenience store without paying. (Compl. at 1-2.) Hunt originally questioned Officer Ho about his conduct but, by the fourth evening, she stopped because he would become upset and intimidate her. (First Hunt Dep 249:1-23.)

After completing her fourth shift with Officer Ho, Hunt contacted the Bureau training department to schedule an appointment with Officer Schilling to discuss Officer Ho's conduct. (First Hunt Dep. 278:17-279:8.) Hunt met with Officer Schilling and Officer Bill Hubner, co-coordinator of the Bureau's field training and evaluation program, and expressed her concerns about Officer Ho.

---

[1]Hunt's specific allegations of misconduct found in the Complaint are not necessarily supported by the evidence she offered in conjunction with her opposition to Defendants' motion for summary judgment. However, because Defendants concede, for the purpose of summary judgment, that the content of Hunt's reports of officer misconduct qualify as protected speech under the relevant Oregon statutes and the First Amendment, and argue only that Hunt's reports of misconduct were made as a part of her job duties or were related to her own misconduct, these allegations are not relevant to the issues before the court. Accordingly, the specific allegations will not be set forth in this Findings and Recommendation.

(First Hunt Dep. 279:13-16.) She complained about Officer Ho's driving, his failure to wear seat belts, his taking free items from 7-Eleven, his lack of knowledge about laws and report requirements, his requiring subjects to provide identification during conversation stops, his use of excessive force in using his gun and shoving a suspect up against a wall, his taking aggressive action without obtaining all of the appropriate information, his failure to properly handle evidence, and his failure to write reports on his use of his weapon. (First Hunt Dep. 279:17-280:12, Def.'s Concise Statement of Facts Ex. 16.) Hunt also reported that she had taken free hot chocolate while working with Officer Pintarich, and that she ran a red light, failed to properly preserve evidence, and submitted a false police report while working with Officer Ho. (Second Hunt Dep. 114:18-115:24.) Officer Schilling then called Sergeant Bryan Parman, advised him that Hunt "actually has something" and suggested that he come and listen to Hunt's complaints. (First Hunt Dep. 280:15-20.) Hunt then repeated her concerns to Sergeant Parman. (First Hunt Dep. 280:22-23.)

At the end of her report, Hunt expressed concern that she had stood up on the table and waved a flag despite the admonitions in the "Joe Schilling has a job" speech, and that she was afraid it would impact her employment with the Bureau. (First Hunt Dep. 285:1-8.) She was assured that everything was fine and that she didn't need to worry about it. (First Hunt Dep. 285:10-12.) However, later in the conversation, Officer Schilling acknowledged that Hunt had raised a flag and advised her that she had a choice, she needed to think about what she was doing, pick her battles carefully, and not make waves. (First Hunt Dep. 287:2-20, 307:1-8.) Officer Hubner remembers Officer Schilling telling Hunt that was not what "standing in the table and raising the flag" meant and that she had an ethical responsibility to step up and confront things that were wrong, unjust, unfair, or illegal. (Hubner Dep. 47:3-9.) During this meeting, either Officer Schilling or Officer

Page 5 - OPINION AND ORDER                                                    {SIB}

Hubner expressed concern that the Bureau had been losing a disproportionate number of females out of the Northeast Precinct for a quite some time but that the Bureau had not yet had a chance to look into it. (First Hunt Dep. 282:19-283:3.)

After sharing her concerns, Hunt indicated that she did not want to work with Officer Ho any longer and that she wanted to be transferred out of the Northeast Precinct. (First Hunt Dep. 285:15-20.) The Bureau gave Hunt a few days off, agreed to transfer her to the Central Precinct immediately, and assured her that it would look into the issues that she had raised. (First Hunt Dep. 285:24-25, 287 21-24.) The Bureau eventually decertified Officer Ho as a field training officer based on his failure to wear seat belts and his improper handling of evidence. (Ho Dep. 176:11-20.)

Later that day, Officer Pintarich contacted Hunt to discuss her reports of misconduct. (First Hunt Dep. 294:16-19.) Officer Pintarich advised Hunt that it was not her job to police the police, that she needed to pick her battles, do what her coach says, get through probation and then be the kind of cop she wanted to be once she was approved and off probation. (First Hunt Dep. 294:22-295:6.)

Officer Schilling testified that on May 31, 2007, Hunt called him and left a message that she was going to come in and resign. (Schilling Dep. 85:7-20). Hunt admits to making the phone call but denies that she indicated an intent to resign. (First Hunt Dep. 301:7-11.)[2] In response to the call,

---

[2]Defendants argue that because Hunt failed to submit controverting evidence with her denial of Officer Schilling's statement that Hunt indicated she wanted to resign, the evidence is deemed admitted. While Hunt did not specifically refer to the controverting evidence in her denial, the record does contain evidence that she did not use or does not recall using the words "I want to resign" in her conversations with Officer Schilling. The court reviews the record as a whole in evaluating the evidence and Defendants' motion for summary judgment. FED. R. CIV. P. 56(c)(2). Additionally, the court questions whether Hunt's use of the specific words "I want to resign" is a material fact in that the record makes it clear that she was considering resigning because of her perception that her continued employment was based on her agreeing to not report any officer

Officers Schilling and Hubner met with Sergeant Parman and Captain Eric Hendricks to discuss Hunt, her possible resignation, and her concerns about retaliation from other officers because of her reports of officer misconduct. (Schilling Dep. 89:20-90:7.) The group agreed that they did not want Hunt to resign. (Hubner Dep. 78:1-7.)

After the meeting, Officer Hubner contacted Officer Pintarich, asked her to provide support to Hunt, and see if she could set up a meeting with Hunt for him. (Hubner Dep. 78:8-23.) Officer Pintarich and Hunt talked for approximately 2 hours. Officer Pintarich told Hunt that both she and Officer Hubner thought Hunt would be a great asset to the Bureau because of her integrity but that she wouldn't be able to work for the Bureau if she couldn't "keep her mouth shut and get through probation." (First Hunt Dep. 297:16-21.)

At Officer Pintarich's urging, Hunt then contacted Officer Hubner and agreed to meet with him at Starbucks. (Def.'s Concise Statement of Facts Ex. 18.) During the meeting, Hunt revealed that she had been told that she should not be surprised if she doesn't receive backup and said that she no longer felt safe as a police officer. (Second Hunt Dep. 42:11-12.) According to Hunt, Officer Hubner explained that Hunt had started a rebellion and pissed people off, and that she was justified in not feeling safe because she "probably wouldn't get backup in Northeast at the time." (Second Hunt, Dep. 40:16-22, 42:12-14, 52:21-25.) When Hunt questioned him about receiving backup at Central, Officer Hubner laughed and avoided the question, which Hunt took to mean that she would not be safe at Central either. (Second Hunt Dep. 41:3-22.) He called her a coward and told her to work, keep her head down, pick her battles, and finish probation. (Second Hunt Dep. 42:15-17.) Hunt indicated that she was happy to go back to work, that she wanted her job, but that she would

---

misconduct during the remainder of her probationary period.

continue to report any misconduct that she witnessed. (Second Hunt Dep. 54:6-17.) Hubner responded "Well, don't be surprised if you don't have a job." (Second Hunt Dep. 54:11-12.) Officer Hubner represented that he told Hunt she did exactly what she was expected to do, that the training department would support her, and that the Bureau would address her complaints. (Hubner Dep. 85:7-17.) He told her that the right thing to do was come back to work. (Hubner Dep. 85:17-22.) Officer Hubner also indicated that he had met with Officer Ho the night before, that he felt Officer Ho was a liar, and that he believed Hunt's version of the events. (Second Hunt Dep. 128:9-17.) At the end of the meeting, Hunt indicated that she no longer intended to resign and would report to work the next day with her new training officer. (Def.'s Concise Statement of Facts Ex. 18.)

As promised, Hunt reported for her first shift at the Central Precinct on June 1, 2007. She went into the locker room, put her uniform and other personal items in her locker, and then became physically ill – she was nauseous, sweating, shaking and vomiting. (Second Hunt Dep. 63:16-24.) Hunt locked her locker, went upstairs to the training department and told Officer Schilling "I can't do this." (Second Hunt Dep. 70:5-12.) Officer Schilling indicates Hunt stated that she was "here to resign." (Schilling Dep. 94:8-22.) At her deposition, Hunt explained that what she meant when she said "I can't do this" was that she couldn't continue to work as a probationary police officer if she was expected to look the other way, keep her head down, and not report misconduct, and that she expected she would be fired if she reported any additional misconduct. However, she did not explain this to Officer Schilling at that time. (Second Hunt Dep. 70:18-71:11.) Officer Schilling told Hunt that he could not accept her resignation but that she could turn her gear into him. (Schilling Aff. ¶9.) Hunt felt that she was terminated by Officer Schilling when he told her to "turn in your gear, you're done." (Second Hunt Dep. 72:11-13, 107:4-5.) She felt that she no longer had

Page 8 - OPINION AND ORDER                                             {SIB}

a job because she would not agree to the new conditions. (Second Hunt Dep. 72:18-20.)

Hunt then met with Captain Hendricks who recommended that Hunt talk to her friends and family. (Second Hunt Dep. 80:10-21.) Captain Hendricks questioned Hunt about her commitment to report misconduct, laughing at her representation that she would report someone if she saw them littering. (Second Hunt Dep. 84:1-7.) He did not tell Hunt that she should not report misconduct in the future but did explain that "there is a level of misconduct that every officer accepts." (Second Hunt Dep. 84:12-15.) Captain Hendricks stated that in police enforcement, as well as in all other professional careers, some workers will have a higher standard of performance than others, that Hunt should take that into account, and that she once she gets off probation and is out on her own, she should try to live up to the high standards she holds. (Hendricks Dep. 82:10-83:12.)

After her meeting with Captain Hendricks, Officer Schilling escorted Hunt to the personnel department where she talked with Sergeant Judy Brumfield. Hunt explained the background of her situation and Sergeant Brumfield commiserated with Hunt, describing a situation during her probationary period where she witnessed something on her shift that she didn't agree with and how that experience led her into internal affairs where she would be able to hold people accountable. (Second Hunt Dep. 87:7-88:12.) Sergeant Brumfield assured Hunt that officer misconduct was investigated, that guilty officers were held accountable, and that the Bureau would handle anyone who spread rumors or otherwise retaliated against Hunt for reporting officer misconduct. (Second Hunt Dep. 88:13-18, 100:8-17.) Hunt recalls Sergeant Brumfield saying "[Y]ou are so close. You only have six months. Just finish probation." (Second Hunt Dep. 93:25-94:1.) Hunt responded that she could and would finish probation but that she would need to report any misconduct that she witnessed and that she would expect an appropriate response from the Bureau. (Second Hunt Dep.

Page 9 - OPINION AND ORDER                                                                 {SIB}

94:1-3.) Sergeant Brumfield "cringed" in response and said "[Y]ou can't, that's not, you know, you just need to do what your coach says and just get through." (Second Hunt Dep. 94:4-6.) Sergeant Brumfield then told Hunt to talk with her family and friends, think about what they talked about and her future with the Bureau, and call her in three days. (Second Hunt Dep. 109:15-25, 115:25-116:5.) Sergeant Brumfield did not specifically tell Hunt not to make further reports of misconduct if she wanted to keep her job but Hunt felt that was the message she was trying to impart. (Second Hunt Dep. 93:13-19.)

The Bureau made arrangements for Hunt to remain on the payroll until June 4, 2007. (Second Hunt Dep. 112:18-23.) On June 4, 2007, Hunt returned to the Bureau to sign the document evidencing her resignation as a police officer. (Second Hunt Dep. 161: 3-12.)

Hunt did not know who had the authority to terminate her employment with the Bureau. (First Hunt Dep. 84:12-84:16.) However, she thought that she had been terminated by Officer Schilling when he told her to turn in her gear and that her conversations with Captain Hendricks and Sergeant Brumfield were intended as an offer to allow her to remain employed by the Bureau if she agreed to accept the Bureau's conditions, namely to not make any more waves by reporting officer misconduct. (Second Hunt Dep. 107:6-25.) Officer Schilling testified that he regularly evaluates recruits and makes recommendations about their advancement to his Sergeant. (Schilling Dep. 22:5-23.) Captain Hendricks has input into the decision to terminate a probationary police officer. (Hendricks Dep. 14:1-3.)

After Hunt's resignation, Captain Hendricks initiated a formal investigation into the Bureau's training curriculum and the retention of probationary officers. (Hendricks Dep. 46:4-10.) Between the summer of 2006 and the time Hunt resigned, the Bureau had lost a disproportionate number of

Page 10 - OPINION AND ORDER                                                                {SIB}

women during the previous eighteen months of probationary training. (Hendricks Dep. 41:1-9.)

Captain Hendricks thought it may have had something to do with the screening process. (Hendricks

Dep. 51:3-6.)(Ellis Decl. Exh. 7.) This opinion was supported by Captain Hendricks's discussions

with Dr. David Corey, who said that he was not surprised by Hunt's, or the other female recruits',

departure from the Bureau based on "test scores that showed each officer would have difficulty

adapting to police work, cognitive problems, inflexibility or other areas that could present difficulty

in completing the probationary process." (Ellis Decl. Exh. 8.)

As part of the investigation, Captain Hendricks ordered a survey of all of the recruits in

Hunt's class. All of them, with one exception, had few complaints about the training department or

their field training officer, and were generally happy with the Bureau and their police training. Of

the ten recruits interviewed, four of them were women. (Ellis Decl Exh. 9.) The one recruit with

complaints was Erin Lewis.

During her probationary period, Lewis made statements, or posed questions, in which she

accused the Bureau of acting in a racist and sexist manner. (Lewis Dep. 57:13-25.) Lewis was

offended by officers use of the term "policeman," finding it demeaning and offensive to women.

(Lewis Dep. 59:6-12. 64:15-16.) Lewis was questioned by Lieutenant Day in a tape-recorded

meeting, at which time Lewis indicated that she had not yet determined if the Bureau was racist or

sexist. (Lewis Dep. 58:6-16.) Lewis denied that she had been the target of harassment, demeaning

comments or discrimination, because she was intimidated by the Bureau's response to her

statements. (Lewis Dep. 64:5-20.) Lewis later accused a fellow officer of using excessive force, but

when questioned by Commander Reese in another meeting stated that the force did not violate

Bureau policy. (Lewis Dep. 96:8-24.) Again, Lewis was confused and concerned about the Bureau's

Page 11 - OPINION AND ORDER                                                    {SIB}

response to her voicing her concerns. She testified that the meetings with supervisors kept escalating and she felt that she was getting in trouble for voicing her concerns. (Lewis. Dep. 96:24-97:2.) Her conduct eventually lead to a probationary performance review in which the Bureau considered terminating her. (Lewis Dep. 97:18-22.) Even after she was no longer employed by the City, Lewis did not report her concerns about excessive force because she feared retaliation. (Lewis 97:23-98:10.) Lewis testified that during her training period two of her field training officers, one in Central Precinct and one in East Precinct, ignored calls for back up from fellow officers because that officer had not "been there" for them in the past. (Lewis Dep. 36:12-24, Second Hunt Dep. 265:13-266:2, Lewis Dep. 36:12-24.)

After her resignation, Hunt heard from a former coworker that when a police officer reported misconduct, it was called "pulling a Lindsay." (Second Hunt Dep. 37:6-9.) The statement was meant to be derogatory. (Second Hunt Dep. 142:5-8.) She was also the likely subject of an article published in the Rap Sheet, a newspaper published by the Portland Officer's Association.[3] (Ellis Decl. Exh. 2, Lewis Dep. 49:12-14.) The article chastised the Bureau, and Portland Police Chief Rosie Sizer, for coddling trainees, referencing the Bureau's attempts to retain officers in training that had complained about officer misconduct or had been recommended for termination by the training

---

[3]In their Reply in Support of Concise Statement of Facts, Defendants object to the Rap Sheet as irrelevant and inadmissible hearsay. Evidence is hearsay only if it is offered to prove the truth of the matter asserted therein. FED. R. EVID. 801. Here, it appears that Hunt is offering the evidence to prove only that the article was written and as further evidence of retaliation, not for the truth of the factual matters asserted therein. Accordingly, the evidence is not hearsay. The court will properly determine the relevance of the evidence in conjunction with its consideration of the summary judgment motion. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal 2006)(noting that various evidentiary objections, such as relevance, were redundant at the summary judgment stage where the court can award summary judgment only in the absence of a genuine issue of material fact based on evidence the contents of which must be admissible).

division. (Ellis Decl. Exh. 2.)   The author, who used a "nom de cyber", advised all future trainees to "try keeping your mouth shut and learning what you can from each of your coaches."   (Ellis Decl. Exh. 2.)

Captain Hendricks denied that the Bureau has policy or practice of discouraging officers from making complaints about the management of the Bureau or of treating complaints from female officers differently from complaints from male officers, and he represented that such a policy or practice would be illegal. (Hendricks Dep. 104:4-17.)   Sergeant Brumfield, Sergeant Parman, Officer Schilling, and Officer Hubner all agreed that such conduct would be wrong. (Brumfield Dep. 42:14-43:3, Parman Dep. 83:1-10, Schilling Dep. 108:9-21, Hubner Dep. 106:14-107:3.)

Hunt has not pursued a career in law enforcement after her experience with the Bureau was not what she anticipated. (First Hunt Dep. 21:13-23.) "I expected to be surrounded with police officers with the utmost integrity, and I was not in an atmosphere where that was supported." (First Hunt Dep. 21:25-22:2.)

### Legal Standard

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.* at 248.  The moving party bears the initial burden of showing "the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). The moving party satisfies its burden by offering the district court the portions of

Page 13 - OPINION AND ORDER                                          *{SIB}*

the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Once the moving party meets its initial burden, the nonmoving party must establish the existence of a genuine issue of material fact. FED. R. CIV. P. 56(e). To meet this burden, the nonmoving party must make an adequate showing as to each element of the claim for which it will bear the burden of proof at trial. *Celotex*, 422 U.S. at 322-23. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). In order to establish that there is a genuine issue of material fact, the nonmoving party "need only present evidence from which a jury might return a verdict in [the nonmoving party's] favor." *Anderson*, 477 U.S. at 257. The evidence set forth must be sufficient to allow a rational jury to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "mere scintilla of evidence in support of the [nonmoving party's] position [is] insufficient." *Anderson*, 477 U.S. at 252. Additionally, the court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).

The Ninth Circuit has cautioned against too readily granting summary judgment in employee discrimination cases because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence

Page 14 - OPINION AND ORDER                                          {SIB}

and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, exceptions, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases." *Schindrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Courts require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry–one that is more appropriately conducted by the factfinder upon a full record." *Id.* (internal quotations and citation omitted). Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and thus "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits." *Id.* (quoting *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Nevertheless, the Ninth Circuit holds that the "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987) (citation omitted). Additionally, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

/ / / / /

/ / / / /

Page 15 - OPINION AND ORDER                                                          {SIB}

*Discussion*

## I. State Retaliation Claims - Violation of OR. REV. STAT. 659A.203 and 659A.230

In her First Claim for Relief, Hunt alleges that the City retaliated against her by reassigning her, threatening her physical safety, threatening to terminate her, and, eventually, terminating her as punishment for reporting Officer Ho's criminal activity, all in violation of OR. REV. STAT. 659A.230. In her Third Claim for Relief, Hunt similarly alleges that the City engaged in the same acts of retaliation against her based on her reporting of violations of federal and state laws by and that, by doing so, the City discouraged, restrained, dissuaded, coerced, prevented, or interfered with such disclosures in violation of OR. REV. STAT. 659A.203.

OR. REV. STAT. 659A.203 and 659A.230 provide protection for public whistleblowers. The statutes generally prohibit employers from taking disciplinary action, including discharging, demoting, suspending, or in any manner discriminating or retaliating against an employee with regard to promotion, compensation or other terms, conditions, or privileges of employment, based on an employee's good faith reporting of a violation of federal or state law.

This court looks to the Title VII retaliation case law to determine whether a plaintiff has established a *prima facie* claim for retaliation under the Oregon Whistleblower Act. *Minter v. Multnomah County*, No. CIV-01-352-ST, 2002 WL 31496404, at *6 (D. Or. May 10, 2002). The *prima facie* elements for a retaliation claim under Title VII are: (1) the plaintiff was engaged in a protected activity; (2) the plaintiff was thereafter subjected by her employer to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003). The City concedes, for the purposes of this summary judgment motion only, that Hunt was engaged in a

protected activity when she reported Officer Ho's conduct to her superior officers. The City argues that Hunt is not able to establish that she was subjected to an adverse employment action or the existence of a causal relation between any adverse action and her protected activity.

### A. Adverse Employment Action

The United States Supreme Court recently held that an adverse employment action, for the purpose of a Title VII retaliation claim, is any action which would dissuade a reasonable worker from engaging in the protected activity and is not limited to actions that are related to the terms or conditions of employment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-70 (2006)(citations omitted.) An adverse employment action does not encompass all retaliation – only that retaliation that is materially adverse to a reasonable employee. *Id.* at 67-68. Context is relevant to the court's inquiry. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 69 (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998)).

In reaching this conclusion, the Supreme Court specifically rejected the defendant's argument that Title VII's anti-relation provision should be read *in pari materia* with the anti-discrimination provision which limits adverse employment actions to conduct that affects the employee's compensation, terms, conditions or privileges of employment. *Id.* at 63. The Court relied on the specific language of each provision to support its distinction, noting that the anti-discrimination provision contained the words hire, discharge, compensation, terms, conditions, or privileges or employment, employment opportunities, and status as an employee, which limited the scope to actions that affected employment or altered the conditions of the workplace, while the anti-retaliation

provision did not contain such limiting words and merely prohibited an employer from "discriminating" against an employee for opposing or reporting an unlawful employment practice. *Id.* at 61-62. The creation of a different definition of "adverse employment action" for each statute gave effect to Congress's intentional use of different terms. *Id.* at 62-63.

The Supreme Court recognized, and inherently adopted, the Ninth Circuit's standard set forth in *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000), which requires a plaintiff to establish that the employer's conduct "is reasonably likely to deter employees from engaging in protected activity" to support a retaliation claim. *Burlington*, 548 U.S. at 61. In *Ray*, the Ninth Circuit held that the test covers lateral transfers, unfavorable job transfers, and changes in work schedules because "[t]hese actions are all reasonably likely to deter employees from engaging in protected activity," but does not cover every offensive utterance by co-workers, because such statements do not generally deter an employee from reporting wrongful conduct. *Ray*, 217 F.3d at 1243. The court then held that the (1) elimination of employee feedback meetings; (2) elimination of a flexible start-time policy; (3) imposition of additional security measures that made it more burdensome for employees to perform their job duties; and (4) reduction in the employee's workload disproportionately to the reductions of other workers, which resulted in disproportionately reduced pay, all constituted an adverse employment action. *Id.* at 1243-44.

Hunt asserts that the Oregon Whistleblower statutes should be interpreted to require the same standard as *Burlington*. The City appears to argue that the express language of the statutes requires the application of a different standard. Even if the court relied on the specific language of the relevant statutes, the standards set forth therein would equate to the standard enunciated by the Supreme Court in *Burlington*.

Page 18 - OPINION AND ORDER                                    {SIB}

The relevant portion of OR. REV. STAT. 659A.203 makes it unlawful for any public employer

to:

> [p]rohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of . . . a violation of any federal or state law, rule or regulation by the state, agency or political subdivision.

OR. REV. STAT. 659A.203(1)(b)(A). This language clearly covers any actions which would prohibit

an employee from engaging in protected activity and includes even the mere threat of future

discipline. OR. REV. STAT. 659A.230(1) provides that:

> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against any employee with regard to promotion, compensation, or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial.

While the language in this statute is not, on its face, as broad as that of the first and the phrase "in

any manner discriminate or retaliate against any employee with regard to promotion, compensation,

or privileges of employment" is comparable to that found in the anti-discrimination provision of

Title VII, the purpose behind the Oregon Whistleblower Act and the anti-retaliation provision of

Title VII remains the same – "to secure that primary objective [of] preventing an employer from

interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the

Act's basic guarantees." *Burlington*, 548 U.S. at 63. There is no justifiable reason to define adverse

employment action differently for the purposes of the two statutes or for the purposes of Oregon's

Whistleblower Act and Title VII.

Hunt argues that her superiors' instructions that she should keep quiet about officer

misconduct, threats that she would lose her job or would not get backup if she continued to report misconduct, and demands that she turn in her badge qualify as adverse employment actions.[4] The City contends that threats of adverse actions if Hunt continued to report misconduct do not qualify as adverse employments actions and that the City was just accepting Hunt's resignation when it directed her to turn in her badge and police gear. The court will now consider these arguments in light of the applicable definition of adverse employment action – whether the City's conduct was reasonably likely to deter Hunt from engaging in protected activity.

### 1. Threats

In its opening brief, the City asserts that this court should look to federal law governing Title VII retaliation cases in assessing claims under Oregon's Whistleblower statutes, acknowledges that the federal courts have recognized that an adverse employment action in a retaliation action is different from that in a discrimination action, and relies on *Burlington* as setting the standard applicable to this case. It then cites to four Section 1983 cases, and a Fair Employment and Housing Act case, to support its claim that mere threats are not adverse employment actions. None of these cases are relevant to the case at hand.

In the civil rights cases, the Circuit courts generally held that threats of prospective adverse conduct were not sufficient to support a constitutional violation. For example, in *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987), after acknowledging that prison beatings which shock the conscience are actionable under section 1983, the court rejected an inmate's claim that threats of such bodily harm intended to prevent him from pursuing legal redress were a violation of his constitutional rights

---

[4]Hunt has apparently decided not to pursue her retaliation claim based on her transfer to another precinct.

{SIB}

to be free from cruel and unusual punishment, and for access to the courts, explaining that "[w]e find no case that squarely holds a threat to do an act prohibited by the Constitutions is equivalent to doing the act itself." The Fifth Circuit held that a conspiracy to commit murder was insufficient to establish an actual deprivation of a constitutional right, which was necessary to support a claim under Section 1983. *Villanueva v. McInnis*, 723 F.2d 414, 418 (5th Cir. 1984). "Implicit in a deprivation is both a defined right and a loss. Stated differently and in sum this claimant has proved no loss of constitutional right. *Id.* at 419. Clearly, the need to establish an actual loss of a constitutional right to support a Section 1983 claim is a much higher standard than the need to prove only that an employer's action would dissuade a reasonable worker from engaging in protected activity. The fact that the threat of harm is not sufficient to support a claim under Section 1983 is not relevant to the question of whether threats to an employee's job security or personal safety would dissuade a reasonable worker from reporting misconduct.

In another case cited by the City, the Ninth Circuit held that the pointing of a gun by an officer at a suspect during a investigation was excessive force and violated the suspect's Fourth Amendment rights to the be free from unreasonable search and seizure. *Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002)(*en banc*). The court then dismissed the claim based on qualified immunity and the fact that the constitutional violation was not sufficiently clearly established at the time the violation occurred. *Id.* at 1016. This holding actually supports a conclusion that the mere threat of bodily injury caused by the pointing of a gun at a suspect is sufficient to establish a constitutional violation. The City appears to have relied on the language of the concurring opinion which agreed with the majority result but disagreed with the finding that a pointed gun, in the absence of a touching or other injury, was excessive force. *Id.* at 1017 ("In my

Page 21 - OPINION AND ORDER                                                {SIB}

view, when the seizure itself is otherwise proper the mere threat of force cannot be an excessive use of force within the meaning of the Fourth Amendment.").

The final Section 1983 case relied upon by the City is more applicable to the case at hand in that it addresses a violation of the First Amendment right to free speech. In *Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998), the court found that a superior's retaliatory threats to transfer or dismiss an employee did not qualify as an adverse employment action. The court explained that while, in a constitutional free speech claim, the adverse employment action, or sanction "'need not be particularly great in order to find that rights have been violated, the plaintiff must nonetheless demonstrate the loss of a 'valuable governmental benefit or privilege.' Mere threats and harsh words are insufficient." *Id.* at 875 (citations omitted). Again, the standard applied by the court in the cited case – the loss of a valuable government benefit or privilege – is stricter than the standard to be applied here. Here, Hunt need only show that a reasonable worker would be dissuaded from engaging in the protected activity. Finally, in the last case cited by the City, the Ninth Circuit relied on *Nunez* in holding that a threat to an employee that he would be fired if he didn't comply with the company's grooming policy did not qualify as an adverse employment action necessary to support a claim for religious discrimination under the Fair Employment and Housing Act. *Lewis v. United Parcel Service, Inc.*, 252 Fed. Appx. 806, 808 (9th Cir. 2007). The court in *Lewis* did not identify which standard it was applying to determine whether the employer's actions were sufficiently adverse. In any event, the reliance on *Nunez*, which clearly applied a stricter standard than applies here, discounts the applicability of the case to that currently before the court.

In sum, all of the cases cited by the City in support of its contention that threats are not adverse employment actions in a Title VII case apply standards more restrictive than that enunciated

Page 22 - OPINION AND ORDER                                                              {SIB}

in *Burlington*, a standard the City concedes in its opening brief is applicable to this action. Clearly, these cases contradict the City's assertion, and the opinion of this court, on which standard is applicable to Title VII retaliation cases, and are not relevant to the issue before the court.

Hunt has presented evidence that after she reported Officer Ho's misconduct, she was discouraged from reporting any future acts of misconduct. While most of the officers assured Hunt that she had done the right thing and that she shouldn't be worried about raising a flag, those same officers warned her that she needed to pick her battles carefully, think about what she was doing, and not make any waves. Captain Hendricks informed Hunt that there was a level of misconduct that every officer must accept. Further, Hunt was told that she should refrain from reporting misconduct during her probationary period and that once she was approved and off probation, she could then be the officer that she wanted to be, which suggests that she should keep quiet in order to keep her job.

In addition, a few of the officers made statements that could be construed as threats that Hunt would be terminated before she completed probation if she continued to report police misconduct. Officer Pintarich advised Hunt that both she and Officer Hubner thought Hunt would make a great officer but that she wouldn't be able to work for the Bureau if she did not keep her mouth shut. When Hunt told Officer Hubner that she wanted to stay with the Bureau but that she would continue to report misconduct, he told her that she should not be surprised if she didn't have a job.

On this point, or particular note for purposes of summary judgment is that Hunt asserts that she was told by fellow officers that she should not be surprised if she did not receive police backup after she requested it. When she shared this threat with Officer Hubner and told him she no longer felt safe, Officer Hubner explained that she had pissed people off, had started a rebellion, and was justified in not feeling safe. When Hunt asked if this problem would continue even after she was

Page 23 - OPINION AND ORDER                                     {SIB}

transferred, Officer Hubner laughed and avoided the question. Hunt presented evidence through the testimony of Erin Lewis, another probationary officer, that it was not uncommon for officers to ignore calls for backup. At least two training officers informed Lewis that they would ignore backup calls when the officer calling for backup had not been there for them in the past. This evidence supports Hunt's claims that her personal safety was threatened by fellow officers refusing to provide backup in response to her requests for assistance.

Threats of termination in the event the employee continues to report misconduct, or threats that an employee will be placed in increased danger to her personal welfare as a result of her reports of misconduct, are clearly adverse and would likely dissuade a reasonable employee from engaging in such protected activities. Accordingly, the court finds that, viewing the evidence in the light most favorable to Hunt, a genuine issue of material fact exists with regard to whether Hunt suffered the requisite adverse employment action in retaliation for her reporting police misconduct to support her claims under the Oregon Whistleblower Act.

2. Termination

Hunt contends that she was terminated on June 1, 2007, when Officer Schilling asked her to turn in her badge. Alternatively, she argues that the City's retaliatory acts forced her to resign, equating to a constructive discharge. The City argues that Officer Schilling merely accepted Hunt's resignation, that the Bureau did not want Hunt to resign and that many of her supervisors encouraged Hunt to stay with the Bureau.

There is no dispute that after her four days with Officer Ho, Hunt was unhappy with the Bureau and frustrated with how it was handling her reports of misconduct. During her May 31, 2007, telephone conversation with Officer Schilling, Hunt made comments that led Officer Schilling

to believe that she was considering resigning. Officer Schilling met with Officer Hubner, Sergeant Parman and Captain Hendricks to discuss Hunt, her possible resignation, and her concerns about retaliation. At that meeting, they agreed that they did not want Hunt to resign. Thereafter, both Officer Pintarich and Officer Hubner met with Hunt to convince her not to resign. They complimented Hunt on her integrity, conveyed the Bureau's desire to keep her on the force, and assured her that the Bureau would support her and address her complaints. However, in virtually the same breath, they told Hunt that if she did not "keep her mouth shut" until she made it through probation, she would not be able to work for the Bureau. Officer Hubner called Hunt a coward, told her she had started a rebellion, and that she was justified in not feeling safe. Despite this, Hunt advised Officer Hubner that she intended to remain with the Bureau and would report for work the next day.

On June 1, 2007, Hunt arrived for work, attempted to get into uniform, and then became physically ill. She testified that she found Officer Schilling in the training department and told him that she could not do "this", meaning she could not continue to work for the Bureau if she could not report misconduct. Officer Schilling testified that Hunt told him she was "here to resign." He advised her that he couldn't accept her resignation but asked her to turn in her gear. Hunt then met with Captain Hendricks and, finally, with Sergeant Brumfield. Sergeant Brumfield commiserated with Hunt and explained that she had also witnessed officer misconduct during her probationary period. She assured Hunt that officer misconduct was investigated and punished, and encouraged Hunt do what her coaches expected and finish probation, noting that Hunt had only six months left. When Hunt indicated that she would finish probation but that she would also continue to report misconduct, Sergeant Brumfield cringed and said "you can't." Sergeant Brumfield then gave Hunt

three days to think about her future with the Bureau and talk with her family about her decision. On June 4, 2007, Hunt returned to the Bureau and signed her resignation documents.

It is clear from the evidence that until Hunt signed her resignation form, she was still considered an employee of the Bureau, was receiving pay from the Bureau, and could have continued working for the Bureau. Even after Officer Schilling asked Hunt to turn in her gear, which she considered to be a termination, she was encouraged to continue her employment with the Bureau and remained on the payroll, until she signed her resignation papers three days later. The fact that Hunt felt that her continued employment was conditioned on her keeping quiet does not alter the fact that she still was still employed and was in control of whether she continued that employment. It is clear from the evidence, even if viewed in a light most favorable to Hunt, that the City did not terminate Hunt. The question of whether Hunt was constructively discharged by the retaliatory acts, however, is not as clear.

To establish a claim of constructive discharge stemming from unacceptable working conditions under Oregon law, a plaintiff must prove:

(1) that the employer intentionally created or intentionally maintained specified working condition(s); (2) those working conditions were so intolerable that a reasonable person in the employees position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

*McGanty v. Staudenraus*, 321 Or. 532, 557 (1995). The determination of whether conditions are "so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question left to the trier of fact. " *Thomas  v. Douglas*, 877 F.2d 1428, 1434 (9th Cir 1989)(citations omitted).

Page 26 - OPINION AND ORDER                                      *{SIB}*

The City argues that Hunt is unable to establish three of these elements. Specifically, the City argues that there is no evidence that it intentionally created the alleged intolerable working conditions, that a reasonable person would not find the working conditions intolerable, or that the City desired to cause, or knew that the conditions would cause, Hunt to resign.[5]

### a. Intentionally Created or Maintained Working Conditions

In its argument that there is no evidence that it intentionally created an intolerable working environment, the City contends that because Officer Ho was not a supervisor, it is not liable for Officer Ho's conduct. In support of this argument, the City relies on the doctrine enunciated in *Mains v. II Morrow, Inc.*, 128 Or. App. 625, 629 (1994) that:

> An employer is liable for constructive discharge if an employee resigns because of intolerable working conditions that a supervisor creates with the intent to force the employee to resign, and the employer is responsible for the conditions under the doctrine of *respondeat superior*.

What the City fails to acknowledge, however, is that Hunt bases her constructive discharge argument on her supervisor's threats that she would be terminated if she refused to keep her mouth shut. The evidence establishes that a number of Hunt's supervisors represented or, at the least, inferred to Hunt to that if she continued to report misconduct while she was a probationary employee, her employment with the Bureau would end. Officer Pintarich told Hunt that she would not be able to work for the Bureau if she did not keep her mouth shut. Officer Hubner told Hunt that if she continued to report misconduct, she should not be surprised if she did not have a job. Additionally, Officer Hubner agreed that Hunt should not feel safe because she probably would not get any backup

---

[5]The City appears to concede the existence of a causal relationship for the purposes of constructive discharge but argues that Hunt is not able to establish a causal relationship for her retaliation claim.

in Northeast based on her whistleblowing activities and refused to answer Hunt's concern that she would not receive backup in the Central Precinct either. When Hunt told Officer Schilling that she could not do this anymore, meaning that she could not keep working if she could not report misconduct, Officer Schilling told her to turn in her badge. Captain Hendricks told Hunt that there was a level of misconduct that every officer must accept and that once she gets off probation, she could try to live up to her high standards. Finally, Sergeant Brumfield advised Hunt that she could not report misconduct while on probation. To the extent Hunt is relying on her supervisors' threats, and the City is responsible for such conduct under *respondeat superior* for such threats, the City is liable for the alleged intolerable working conditions supporting Hunt's constructive discharge claim.

### b. Intolerable Working Conditions

The question of whether the City's imputed conduct would have caused a reasonable person to resign is more problematic. The conduct Hunt complains of occurred over a three- to four-day period and consists of threats to her personal safety and continued employment. It is evident that Hunt found the conduct to be intolerable based on her testimony that she felt physically ill the morning she attempted to report for her first shift at Central Precinct and subsequently, even after three or four days to consider her decision, opted to resign rather than face likely termination and possible bodily injury if she continued her employment and reporting activities. However, this does not necessarily mean that a reasonable person would have acted in the same manner.

The Ninth Circuit addressed a similar situation in *Thomas v. Douglas*, 877 F.3d 1428 (9th Cir. 1989), in which the plaintiff, a police officer, reported possible rule violations and criminal conduct by three other officers. The plaintiff requested a transfer because he feared possible retaliation from his fellow officers, particularly the ones he reported. The plaintiff's request was

Page 28 - OPINION AND ORDER                                    {SIB}

denied based on the plaintiff's agreement at the time of hire that he would serve at his station until a replacement deputy was hired and could replace him. The plaintiff tendered his resignation even though he knew that he would not be replaced for eight to ten weeks. *Thomas*, 877 F.2d at 1429-30. The plaintiff filed an action against the sheriff and the county alleging claims for violation of his First Amendment free speech rights under § 1983, wrongful constructive discharge, and intentional infliction of emotional distress. *Id.* at 1429

The court granted summary judgment for defendants on the First Amendment claim finding that plaintiff's exercise of his free speech rights was not a substantial or motivating factor in the decision to deny the transfer because plaintiff's assignment would have continued regardless of his reports of misconduct and that he was not in any imminent danger that defendants had a duty ro avert. *Id.* at 1431. In addressing the constructive discharge claim, the court applied the federal standard that a "constructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in [the employee's] position would have felt that he was forced to quit because of intolerable and discriminatory working conditions" noting that it was similar, if not identical, to the relevant state standard. *Id.* at 1434 (internal quotations and citations omitted). The court found that while the evidence established that it was not unreasonable for the plaintiff to feel uncomfortable in his work environment, the feeling was more a product of human nature than of anything the defendants did, and dismissed the wrongful discharge claim. The court reasoned that "Thomas was not required to perform any unusually dangerous or onerous duties, and he was not subjected to any harassment or violent acts or any other treatment which could be considered punishment or retaliation." *Id.*

Unlike the plaintiff in *Thomas*, Hunt has presented evidence that she was told that she should

Page 29 - OPINION AND ORDER                                                            {SIB}

not be surprised if she did not receive backup and that a supervisor told her she was justified in not feeling safe. Accordingly, she has presented evidence that her concerns for her safety were objectively based on the conduct of others. Here, Hunt had the additional concern that she would lose her job if she continued to report misconduct while she was a probationary officer. Additionally, the trier of fact could find that this conduct was in retaliation for Hunt's reports of misconduct.

While the conduct attributable to the City is not sufficiently egregious as to shock the conscience or clearly fall qualify as intolerable, viewing the evidence in the light most favorable to Hunt, the nonmoving party, the court finds that a reasonable person could find the conditions Hunt was facing intolerable. Hunt's job as a probationary police officer was risky enough under the best circumstances, but to add the possibility that Hunt would not receive the assistance of fellow officers in a time of need makes it even more potentially dangerous. Coupling this concern with the likelihood that she would lose her job if she continued to report police misconduct or criminal activity even further supports the claim that Hunt was reasonable in resigning because of her work conditions.

The City argues that because Hunt never reported for work at the Central Precinct, she is unable to establish that she would continue to face the negative treatment she was subjected to prior to her transfer. Again, this argument assumes that Hunt is basing her constructive discharge claim on the conduct of her field training officer. To the contrary, Hunt's pleadings and the evidence before the court establish that the conduct she primarily complains of is that of her supervisors, who warned her to stop reporting misconduct if she wanted to keep her job, and the likelihood that officers at both Northeast and Central Precincts would not provide her with backup, which likelihood

Page 30 - OPINION AND ORDER                                                                 {SIB}

was corroborated by Officer Hubner. This conduct is just as likely to occur while Hunt is assigned to Central Precinct as it was while she was at Northeast Precinct.

c. Desire to Cause or Knowledge that the Employee Would Resign

Finally, the City argues that because it continually tried to convince Hunt to remain on the force and did not want her to quit, Hunt is unable to establish that the City desired to cause her to leave her employment as a result of her working conditions or knew that she was substantially certain to leave employment as a result of those conditions. There is evidence that the City agreed to transfer Hunt, began investigating her reports of misconduct, reassured her that they would work to stop any retaliation, tried to talk her out of resigning, and gave her paid time off to reconsider her resignation. All of this supports the City's contention that it did not want Hunt to leave her employment with the Bureau. However, every officer who encouraged Hunt to remain employed by the Bureau also told her that she should not report officer misconduct until she was off probation and most told her that if she did, she would lose her job. This evidence allows a reasonable inference that the City wanted Hunt to remain employed but only if she agreed to not report any misconduct in the future, at least until she was off probation. In other words, the City's retention of Hunt as an employee was subject to her remaining quiet. If she continued to report misconduct, she was facing termination. Viewed in the light most favorable to Hunt, the evidence establishes that the City's primary goal was to keep Hunt quiet, even if it meant it had to terminate her, and that the City was more than willing to accept her resignation if she refused to keep quiet. In addition, there is evidence that Hunt reported to a superior officer that fellow officers had threatened her safety and the City did nothing to investigate the threats. To the contrary, Hubner told Hunt that she was justified in her concern because she angered or upset people and started a "rebellion".

Page 31 - OPINION AND ORDER                                        {SIB}

Again, viewing the evidence in a light most favorable to Hunt, the court finds that she has raised a genuine issue of material fact with regard to whether the City desired to cause Hunt to resign or had reason to believe that its conduct would cause Hunt to resign. A trier of fact could find that the City knew that Hunt was likely to resign based on the threats to her safety and on its requirement that Hunt keep quiet or be terminated viewed in light of Hunt's statements to her supervisors that she wouldn't keep quiet.

### B. Causal Relationship Between Adverse Actions and Whistleblowing

The City argues that under Oregon law, Hunt must prove that the adverse actions would not have occurred but for the discriminatory motive. It then states that Hunt can not prove causation. No additional argument or explanation is offered. The evidence unequivocally establishes that the adverse actions – the threats against Hunt's safety and of termination, and her resulting resignation – were direct responses to Hunt's whistleblowing activities.

### C. Burden Shifting Analysis/Legitimate Nonretaliatory Reasons for Adverse Actions

Hunt has offered evidence that, when viewed in a light most favorable to her, raises a genuine issue of material fact on the existence of an adverse action and a causal relationship on her claims under the Oregon Whistleblower Act. The City then argues that it had legitimate nonretaliatory reasons for the adverse actions it took against Hunt and that, under the federal burden-shifting framework, Hunt has the burden of proving that nonretaliatory reasons are pretext.

In a previous case involving the City and the Bureau, this court recognized that Oregon has rejected the federal burden-shifting scheme and held that in cases where the state law claim is before the federal court on supplemental jurisdiction, the court must honor the directive of the Oregon courts. *Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1212 (D. Or. 2009). Hunt's Oregon

Page 32 - OPINION AND ORDER                                    *{SIB}*

Whistleblower claims are before this court on supplemental jurisdiction. Accordingly, the burden-shifting framework does not apply to the City's motion for summary judgment on Hunt's First and Third Claims for Relief. However, even if the court were to shift the burdens in accordance with federal law, the City's argument that it had legitimate nonretaliatory reasons for its adverse actions against Hunt does not carry its summary judgment burden.

The City argues only that it accepted what it believed to be a voluntary resignation and that such acceptance is a legitimate nonretaliatory reason for Hunt's termination. The City fails to provide legitimate nonretaliatory reasons for the threats it made to Hunt that if she didn't keep her mouth shut, she would be terminated, or for the threats made to Hunt's personal safety, and fails to recognize that Hunt's "voluntary resignation" was a direct result of these threats.

### D. Reports of Own Misconduct

Finally, the City argues that Hunt is unable to pursue a claim under OR. REV. STAT. 659A.203 because some of the misconduct she reported was her own. OR. REV. STAT. 659A.206(5) provides that OR. REV. STAT. 659A.200 to 659A.224 are not intended to "restrict or preclude disciplinary action against an employee . . . if the information disclosed relates to the employee's own violations, mismanagement, gross waste of funds, abuse of authority, or endangerment of the public health or safety." The City then states, without citation to any authority, that "[d]isciplinary action is defined broadly, and includes termination." (Defs.' Mem. of Law in Supp. of Summ. J. at 18.)

In the only case cited by the parties on this issue, this court found that where the plaintiff participated in a significant portion of the wrongful activity and resigned her position before she reported the wrongful activity, the plaintiff was barred by OR. REV. STAT. 659A.206(5) from

Page 33 - OPINION AND ORDER                                          {SIB}

pursuing a claim under the Oregon Whistleblower Act. *Reyna .v City of Portland*, No. 02-980-JO, 2005 WL 708344, at *7 (D. Or. March 28, 2005). It is unclear from the opinion what wrongful activity the plaintiff was complaining about, what retaliatory discipline she was subjected to, or even what misconduct constituted a "significant portion" of the misconduct reported. This court has had the opportunity to consider the predecessor to the statute at hand. In *Minter v. Multnomah County*, No. CIV-01-352-ST, 2002 WL 31496404, at *3-4 (D. Or. May 10, 2002), a county employee admitted that she had falsified figures in an operating expense report and explained that she had done so at the direction of her direct supervisor. The employee was terminated for knowingly and deliberately falsifying documents and she filed an action asserting, among others, a claim for violation of the Oregon Whistleblower Act. Id. at *6. The court granted defendants' motion for summary judgment on plaintiff's whistleblower claim noting that while the employee reported her supervisor's intimidation, it was only relevant to explain her own misconduct. All of the information disclosed clearly related to her own violations. Accordingly, under the unambiguous language of OR. REV. STAT. 659.515(5), currently OR. REV. STAT. 659A.206(5), the employee was unable to state a claim under the Whistleblower Act. *Id.* at *7-8.

Hunt admitted to Officer Schilling and Officer Hubner that she had engaged in misconduct by taking free hot chocolate, running a red light, failing to properly preserve evidence, and submitting a false police report. Hunt's contention that Officer Ho ordered her to engage in some of this misconduct does not remove her from the scope of OR. REV. STAT. 659A.206(5). However, this court finds that because the retaliatory conduct of which Hunt complains was not the result of her own reported misconduct, OR. REV. STAT. 659A.206(5) does not apply to her in this instance.

The court in *Minter* summarized the effect, and arguably purpose, of the relevant statute as

Page 34 - OPINION AND ORDER                                        {SIB}

prohibiting an employee from blowing the whistle on herself to save herself from disciplinary actions. *Minter*, at *7. Inherent in this observation is that the disciplinary action must be based on the underlying misconduct, not the reporting of such misconduct. If the employee was to be disciplined for merely reporting the misconduct, engaging in such act would *not* save her from disciplinary actions related to the misconduct and the purpose of the statute would not be achieved. While it is unknown what retaliatory acts the employee in *Reyna* complained of and what precipitated those acts, it is clear in *Minter* that the employee was terminated because of her misconduct, not because she reported misconduct. In this case, the retaliatory acts against Hunt were not related to her misconduct.

There is no evidence in the record that Hunt was not disciplined in any way for her own misconduct. To the contrary, even after Hunt reported such misconduct, she was praised as a probationary officer and encouraged to remain with the force. The Bureau investigated the allegations Hunt made against Officer Ho and, eventually, disciplined him for misconduct, but did not take any action against Hunt. The adverse employment actions Hunt complains of relate solely to her acts of reporting the misconduct. Her continued employment then was threatened if she continued to report misconduct. She was told she needed to keep silent during the remainder of her probationary period or likely be terminated and that every officer had to accept a "level of misconduct". This retaliatory conduct had nothing to do with Hunt's misconduct and everything to do with her reporting of another officer's misconduct. Similarly, her fellow officers' threats not to provide her with backup were related to her reports of Officer Ho's misconduct, not her own violations. Hunt was advised that she had "pissed people off" and started a "rebellion" and, as a result, she was justified in not feeling safe. No reasonable trier of fact could find that these threats

Page 35 - OPINION AND ORDER                                              {SIB}

against Hunt were in response to her admissions of wrongdoing and not her reports of Officer Ho's misconduct. Because the City "disciplined" Hunt for reporting Officer Ho's misconduct and not because she herself engaged in misconduct, OR. REV. STAT. 659A.206(5) does not apply in this case and does not bar Hunt's claims under the Oregon Whistleblower Act.

Hunt has presented sufficient evidence to support her claims for retaliation under Oregon's Whistleblower Act. The City's motion for summary judgment on Hunt's First and Third Claims is denied.

## II. State Gender Discrimination Claims - Violation of OR. REV. STAT. 659A.030

Hunt alleges in her Second Claim for Relief that Officer Ho's gender-based comments and conduct created a hostile working environment, and that her gender was a substantial and motivating factor in the City's initiation of disciplinary action against her. The City argues that Hunt is unable to establish the adverse employment action necessary to support a discrimination claim or that the City's legitimate nondiscriminatory reasons for its actions are pretextual under the balancing test. The City's argument that Hunt has failed to allege an adverse employment action is at odds with Hunt's allegations, and argument, that she was subjected to a hostile environment based on Ho's gender-based comments, an inconsistency seemingly recognized by the City in its reply memorandum.[6]

Similar to the retaliation claim, "[t]he standard for establishing a prima facie case of

---

[6]Hunt argues in her opposition memorandum that the City's acknowledged loss of a disproportionate number of women from the police force supports her gender discrimination claim. At oral argument, Hunt represented that she was pursuing a disparate treatment claim. Under Title VII, an individual suffers disparate treatment when she is singled out and treated less favorably than other similarly situated males because of her gender. The claim that the City was discriminating against women as a whole based on its policies and procedures is more properly considered as evidence of a disparate impact claim and is not relevant to Hunt's claim of hostile environment.

Page 36 - OPINION AND ORDER                                                              {SIB}

discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Under federal law, a plaintiff establishes a *prima facie* case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). A plaintiff can meet this burden by showing that she has been singled out and treated less favorably than others similarly situated because of a protected class status. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir. 2004)(applying standard in race discrimination case). A plaintiff can establish a *prima facie* case of discrimination in one of two ways. First, the plaintiff could present direct evidence of discriminatory intent. *Wallis v. J.R. Simplot, Co,*, 26 F.3d 895, 889 (9th Cir. 1994). "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Vasquez v. Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). Second, the plaintiff alternatively could establish that: "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin*, 150 F.3d at 1220 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Clearly, in this instance, a plaintiff is required to show that she suffered an adverse employment action. However, when a plaintiff is alleging discrimination based on the creation and maintenance of a hostile environment, the existence of an adverse employment action gives way to the existence of an intimidating and offensive work environment.

Under Title VII, "[a] 'hostile work environment' occurs when there is a pattern of ongoing

Page 37 - OPINION AND ORDER                                    {SIB}

and persistent harassment severe enough to alter the conditions of employment." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998)(citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66-67 (1986).    Title VII's prohibition on discrimination encompasses "discriminatory intimidation, ridicule and insult" that alters the conditions of the victim's employment and creates an abusive working environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The standard is both subjective and objective: the victim must perceive the environment as abusive, and the environment must be one that a reasonable person would find hostile or abusive. *Id.*  Title VII does not prohibit all verbal or physical harassment in the workplace. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). To support a claim of sexual harassment, conduct directed at the plaintiff must be both discriminatory and pervasive.

Workplace harassment, even harassment between men and women, is not automatically sex discrimination "merely because the words used have sexual content or connotations." *Id.*  Rather, the plaintiff must always prove that the conduct at issue was "not merely tinged with offensive sexual connotations, but actually constituted *discrimination* because of sex." *Id.* at 81 (emphasis in original).   Even in the absence of language or conduct of a sexual nature, a plaintiff may establish workplace harassment if the conduct makes it "clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.* at 80.

> Determining the type of conduct that constitutes a hostile work environment requires:
>
> careful consideration of the social context in which particular behavior occurs and is experienced by its target ... [and it] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Draper*, 147 F.3d at 1109 (citing *Oncale*, 523 U.S. at 81). "Conduct that is not severe or pervasive

Page 38 - OPINION AND ORDER                                              *{SIB}*

enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 21). *See also Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992)(isolated incidents of sexual horseplay or inappropriate behavior over a period of years not so egregious as to render work environment hostile); *Benitez v. Portland General Elec.*, 799 F. Supp. 1075, 1080-81 (D. Or. 1992)("Isolated comments or sporadic incidents of harassment, without more, will not support a hostile environment claim.").

If a hostile working environment is found to exist, an employer will be held liable for failing to take adequate remedial measures to remedy harassment of which it knew or should have known. "These measures must include immediate and corrective action reasonably calculated 1) to end the current harassment, and 2) to deter future harassment from the same offender or others." *Yamaguchi v. U.S. Dept. of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997) (citations omitted). "The adequacy of the employer's response depends on the seriousness of the sexual harassment." *Id.* (citing *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).

The evidence presented by Hunt establishes that over a period of four days while working with Officer Ho in the Northeast Precinct, she was referred to as a "princess" and a "girly girl", was told she needed to toughen up because it is a "boy's world", and was accused of being "too good to hang out with the boy's club". Hunt felt that Officer Ho seemed more approachable by and communicative with male, as compare to female, trainees. Based on this evidence, the court finds that a reasonable trier of fact could not find that Hunt was subjected to a sufficiently hostile environment based on her gender to support a claim for gender discrimination.

There is nothing in the record that indicates that Hunt reported any of this activity to her

Page 39 - OPINION AND ORDER                                                          {SIB}

superiors when she was reporting Officer Ho's misconduct, which is evidence that she did not subjectively perceive the environment as hostile at that time. Additionally, while the comments were clearly related to Hunt's gender, they were not sexually explicit or offensive, and were not severe or pervasive enough to create an objectively hostile or abusive work environment under the reasonable woman standard.

Even assuming that Hunt has presented evidence of a hostile environment and that she reported it to her superiors, the City took action immediately to remedy the situation. The City agreed to assign Hunt to another training officer and transferred her to another precinct and Officer Ho was eventually disciplined for his misconduct. Hunt has failed to present evidence that the hostile environment based on her gender would have continued at the new precinct or with her new training officer.

In the absence of evidence that Hunt was subjected to a hostile environment and in light of the evidence that the City took action to remedy the gender-based discrimination, Hunt is unable to support her claim for discrimination under state law. The City is entitled to summary judgment on Hunt's Second Claim for Relief.

III.  Violation of Free Speech Rights - Violation of the First Amendment/42 U.S.C. § 1983

In her Fourth Claim for Relief, Hunt alleges that the City has a policy or custom of "discouraging whistleblower activities by female police officers and covering up officer misconduct, including Constitutional and criminal violations" and that the City was acting in accordance with this custom or policy when it engaged in retaliatory acts against Hunt. Hunt also alleges that Officer Hubner, Officer Schilling, Captain Hendricks, Sergeant Parman, and Sergeant Brumfield (collectively the "Individual Defendants"), are individually liable for their contribution to the

violation of her First Amendment rights. Defendants argue that because Hunt, as a probationary police officer, was required to report misconduct, she is not entitled to constitutional protection.

Public employees cannot be forced to relinquish their First Amendment rights simply because they accept the benefit of public employment. *Tucker v. State of California Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996)(citing *Pickering v. Board of Educ.*, 391 U.S. 563 (1968)). To establish a claim that a public employer has unlawfully infringed his or her constitutionally protected interest in freedom of speech, a public employee must generally show that the speech in question was constitutionally protected and was a substantial or motivating reason for an adverse employment action. *Chateaubriand v. Gaspard*, 97 F.3d 1218, 1222 (9th Cir. 1996)(*citing Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1996)). If the employee meets this burden, the government employer may avoid liability by establishing that it had adequate justification for treating the employee differently that the general public or that it would have taken the same action regardless of the protected conduct. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

### A. Speech Addresses Matter of General Public Concern

A public employee's speech is constitutionally protected when the employee is speaking as a citizen expressing his or her personal views on matters of general public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). "A matter of public concern" is a matter that fairly relates to political, social or other aspects of the community. *Id.* It does not include speech relating to purely personal or internal administrative matters. *Id.* at 154. Thus,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147. In *Connick*, the Court held that plaintiff's speech did not involve issues of public concern where the speech did not seek to inform the public either that the public employer was "not discharging its governmental responsibilities" or "to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148. Rather, the court found that plaintiff was merely "upset with the status quo" and that the discharge did not violate any First Amendment right. *Id.*

Defendants do not argue that Hunt's speech did not address matters of public concern and apparently concedes that this requirement has been met. The court agrees to some degree. The Ninth Circuit has specifically held that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004). Accordingly, Hunt's reports of Officer Ho's bad driving, failure to wear seatbelts, stealing of items from 7-Eleven, and use of excessive force, all of which could be characterized as unlawful conduct, qualify as matters of public concern.

It is a closer question whether Hunt's complaints that Officer Ho did not know about laws or report requirements, failed to handle evidence properly, and failed to prepare a report on his use of his weapon, are a matter of public concern. Complaints by two police officers about their superior's management style, which included allegations that he created a hostile work environment by violating internal policies, were found to not address matters of public concern in *Desrochers v. City of San Bernadino*, 572 F.3d 703 (9th Cir. 2009). The court based its decision on the content of the communications ("dissatisfaction with a superior's management style and the ongoing personality dispute which resulted"), the context of the communication ("the speech at issue took the form of internal employee grievances which were not disseminated to the public"), and concern behind the communication ("the ultimate source of the grievances can be traced to the simple fact

that the [officers] and their [superior] did no get along"). *Id.* at 714-16. This court has similarly held

that a police officer's letter criticizing an internal investigation into his conduct addressed to superior

officers in the police force did not constitute a matter of public concern. *Nederhiser v. Foxworth*,

Civil Case No. 05-787-KI, 2007 WL 869710 (D. Or. March 21, 2007). Here, Hunt complained

internally about Officer Ho's violations, and lack of knowledge, of internal policies. However,

Officer Ho's conduct in this regard could affect individuals outside of the Bureau and Hunt's intent

in making the complaints might arguably have been to protect the public. Therefore, the decision

to be made here is closer than that involving the speech considered by the Ninth Circuit in

*Desrochers* or this court in *Nederhiser*, and that conduct could also be seen to address an issue of

public concern. In any event, because the court finds that Hunt was acting in her official capacity

in making the complaints, as argued by Defendants and discussed below, this issue need not be

decided at this time.

### B. *Speech Made as a Private Citizen, Not Pursuant to Official Duties*

The Supreme Court recently created a second factor to consider in determining whether a

public employee's communications is constitutionally protected. In *Garcetti v. Ceballos*, 547 U.S.

410, 421 (2006), the Court held that "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline" thereby requiring a

public employee to establish that the public employee engaged in the communication as a private

citizen in addition proving that the content of the speech was a matter of public concern. The Court

explained that restricting the protection afforded public employees under the First Amendment with

regard to employment-related communications gives the government the ability to discipline

Page 43 - OPINION AND ORDER                                                      {SIB}

employees for conduct related to such communications and prevents the employee from attempting to "constitutionalize" every employee grievance. *Id.* at 420 (citing *Connick*, 461 U.S. at 154). Defendants assert that Hunt's reports of Officer Ho's misconduct were made as part of her job duties and do not qualify as protected speech.

In *Garcetti*, a deputy district attorney criticized, orally and in writing, the affidavit supporting a search warrant and recommended dismissing all charges based on the warrant. *Id.* at 413-14. Subsequently, the attorney was subjected to adverse employment actions which he alleged were in retaliation for his critical communications. *Id.* at 415. The Supreme Court found that because the attorney's communications were made pursuant to his official duties, the communications were not protected under the First Amendment. *Id.* at 424. While it did not create a rule for determining when a public employee is acting within the scope of his duties because the parties had conceded this issue, the Court did state that:

> [t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is with the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25.

Shortly thereafter, the Ninth Circuit applied the rule enunciated in *Garcetti* and articulated a general framework to determine when communications fall within a public employee's job duties. *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006). In *Frietag*, the plaintiff, a female corrections officer working at a state prison, complained to prison officials that inmates were engaging in sexually hostile misconduct and that her supervisors were procrastinating or refusing to respond to her reports. *Id.* at 533-34. When the prison officials ignored her internal reports of misconduct and then

Page 44 - OPINION AND ORDER                                                    {SIB}

began retaliating against the plaintiff, she filed a formal complaint with the state of California alleging sexual harassment by the inmates and the failure to take action to stop the harassment by her supervisors or prison officials. *Id*. at 534. She also sent a letter to a state senator and contacted the Office of Inspector General complaining that female officers were regularly subjected to sexually abusive behavior at the prison and that supervisors were failing to respond to her complaints. *Id*. at 535. The plaintiff was subsequently investigated, disciplined and terminated. *Id*. at 535-36. The plaintiff filed an action against her supervisors and prison officials alleging, among other things, retaliation in violation of her First Amendment free speech rights. *Id*. at 536. The trial court advised the jury that all of the plaintiff's speech was protected by the First Amendment and the jury returned a verdict in the plaintiff's favor. *Id*. at 536-37, 544.

The defendants appealed arguing that the jury had erred in finding for the plaintiff on her First Amendment claim, in part, because the communications were not protected speech. The Ninth Circuit found that, under *Garcetti*, the plaintiff's written and oral communications to a state senator and the Office of Inspector General complaining about the sexual abuse suffered by female officers as a result of the prison's failure to respond to her reports, were made in her capacity as a citizen about an issue of public concern and, therefore, qualified as protected speech. *Id*. at 545. The court explained that the "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee" and that the plaintiff did not "lose her right to speak as a citizen simply because she initiated the communications while at work or because they concerned the subject matter of her employment." *Id*. It reasoned and then held that:

It was certainly not part of [Freitag's] official tasks to complain to the Senator or the

IG about the state's failure to perform its duties properly, and specifically its failure to take corrective action to eliminate sexual harassment in its workplace. Rather, it was Freitag's responsibility *as a citizen* to expose such official malfeasance to broader scrutiny. Accordingly, in these instances, for purposes of the First Amendment she spoke as a citizen.

*Id.* (emphasis in original).

On the other hand, the Ninth Circuit held that plaintiff's internal reports of sexual misconduct to her supervisors, either formally or informally, and her complaints about her supervisors procrastination or refusal to respond to these reports to prison officials, were submitted by her pursuant to her official duties as a corrections officer and were not entitled to protection. *Id.* at 546. "For the purposes of First Amendment analysis, Freitag submitted those reports pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen." *Id.*

Subsequently, the court found that when an engineer for a state ferry system who was responsible for ensuring that his ferry mechanical and electrical systems were properly functioning reported that the management was engaging corrupt financial practices, he was not acting pursuant to his job duties. *Marable v. Nichtman*, 511 F.3d 924 (9th Cir. 2007). The court stated that "it cannot be disputed that [Marable's] job was to do the tasks of a Chief Engineer on his ferry, and such tasks did not include pointing to corrupt actions of higher level officials whom he purportedly thought were abusing the public trust and converting public funds to their own use by overpayment schemes." *Id.* at 932. The Ninth Circuit distinguished this scenario from the reports of wrongdoing made by Frietag to her supervisors reasoning that in *Freitag*, the "plaintiff's communications about her supervisor's actions directly concerned and were pursuant to her role as a correctional officer overseeing inmates" while "Marable's official duties did not extend so far as to encompass the communications at issue." *Id.* at 933. The court rejected the defendant's argument that Marable

was obligated to report the wrongdoing based on the general language in his employment manual that he must "know and enforce all applicable and federal rules and regulations" relying instead on the duties Marable was actually obligated to perform. *Id.* at 933 n.13.

In a recent case involving police officers, the Ninth Circuit held that a police officer's communications with the county district attorney, the FBI, and the grand jury with regard to an investigation of corruption in the police department and communications with his supervisor and the city manager with regard to the results of his investigation of corruption in a public golf course all were made in his official capacity as a police officer. *Huppert v. City of Pittsburg*, 574 F.3d 696, 705-10 (9th Cir. 2009). The Ninth Circuit based its opinion on the fact that the officer was either specifically assigned to participate in the investigations or was generally obligated by the duties of a police officer to provide the information. *Id.* Specifically, the court noted that California courts had, on many occasions, described a police officer's duties as follows:

> Among the duties of police officers are those of preventing the commission of crime, of assisting in its detection, and of disclosing all information known to him which may lead to the apprehension and punishment of those who have transgressed our laws. When police officers acquire knowledge of facts which will tend to incriminate any person it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury. It is for the performance of these duties that police officers are commissioned and paid by the community.

*Id.* at 707, (quoting *Christal v. Police Commissioner of City and County of San Francisco*, 33 Cal. App. 2d 564, 92 P.2d 416, 419 (1939).

While Oregon courts do not appear to have delineated the general duties of a police officer in this state, the courts have recognized that city police officers are responsible for enforcing state laws. *State v. Cooper*, 319 Or. 162, 170 (1994). They have also acknowledged that "[p]olice

Page 47 - OPINION AND ORDER                                                          {SIB}

officers have a duty to uphold the constitution of this state . . .". *State v. Isom*, 306 Or. 587, 595 (1988). Similarly, this court has recognized that a police officer has a duty "to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Ilias v. Johnson*, Civil No. 07-513-ST, 2008 WL 4838846, at *10 (D. Or. Nov. 5, 2008)(quoting *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Additionally, on at least two occasions, members of the Oregon state police force have conceded in federal court that, as police officers, they have a duty to report misconduct to their employer. *Courtney v. Oregon State Police*, No. 08-35688, 2009 WL 3368437, at *2 (9th Cir. Oct. 21, 2009)("Here, Courtney conceded that, as a police officer, he had an official duty to report any misconduct."); *Eberz v. Oregon Department of State Police*, Civ. No. CV-06-641-TC, 2008 WL 697419, at *11 (D. Or. March 14, 2008)("Plaintiff has testified that his job duties included the duty to report misconduct within OSP. . . . Plaintiff declared that his duty extended to reporting misconduct to the supervisory level.")

Hunt appears to concede that, generally, a police officer is officially obligated to report unlawful conduct and misconduct to their superiors, and that she was initially held to these same obligations. Further, Hunt does not dispute that the City's rules required her to report inappropriate behavior and misconduct or that, as a police officer, she was responsible for the enforcement of statutes and laws. However, she argues that Officer Schilling's "I have a job" speech and Officer Pintarich's statement that it was not Hunt's job to police the police altered her official obligations. Neither Officer Schilling nor Officer Pintarich had the authority to alter Hunt's official duties under state law or Bureau policy. Therefore, Hunt remained obligated as a police officer to report Officer Ho. Also, the Supreme Court cautioned that the inquiry into whether a public employee's speech is pursuant to employment duties is a practical one and that written job descriptions are neither

Page 48 - OPINION AND ORDER                                                                              {SIB}

necessary or sufficient to prove that a certain task falls within the scope of a public employee's duty for First Amendment purposes. *Garcetti*, 547 U.S. at 424-25. The court must consider all of the relevant evidence to determine the extent of a public employee's job obligations. The court is convinced that as a police officer, Hunt had an official duty to report unlawful activity as well as misconduct within the Bureau despite the general comments made by Officer Schilling and Officer Pintarich.

Hunt complained about conduct of Officer Ho which could be viewed as violations of state law. She stated that he refused to wear his seat belt, ran red lights while driving, and took items from a 7-Eleven store without paying. Additionally, Officer Ho's asking for identification during conversations stops, use of excessive force, and failure to properly handle evidence all have constitutional implications. Hunt acknowledges as much in her allegations that the City discouraged her from reporting, and covered up, officer misconduct consisting of Constitutional and criminal violations. Hunt's other complaints about Officer Ho's lack of knowledge about, and failure to follow, report requirements are evidence of Officer Ho's misconduct within the Bureau, and relate specifically to Officer Ho's qualifications as a training officer to Hunt. The complaints were made to Hunt's supervisors within the Bureau, not   employees. The court finds that all of this communication was made by Hunt pursuant to her job duties and official capacity as a probationary police officer. Accordingly, she did not engage in protected speech and her First Amendment claim fails.

Hunt argues that summary judgment is inappropriate because she refused to engage in wrongful conduct and that such refusal is never part of an employee's official job duties. Hunt relies

on *Fierro v. City of New York*, 591 F. Supp. 2d 431, 444 (S.D.N.Y. 2008),[7] wherein the court held that a public employee's "refusal to commit wrongful acts as directed by his supervisor was not made in the context of a strictly employer-employee dispute, but was spoken as a citizen rejecting the corrupt direction of a supervisor." Accordingly, the court held that the act of refusing to lodge false accusations against a fellow teacher was protected under the First Amendment. *Id.* Hunt alleges that her refusal to falsify reports and destroy evidence is conduct entitled to protection. However, the evidence establishes that Hunt did not refuse to engage in such acts. Rather, she admitted that she complied with Ho's directions by failing to properly preserve evidence and filing a false police report. Similarly, Hunt reported police misconduct despite after she heard the "Schilling has a job" speech which allegedly directed her not to report such conduct. Because Hunt engaged in the wrongful acts rather than refusing to do so, the holding in *Fierro* does not apply to her situation.

The court finds that, as a matter of law, Hunt did not engage in communicating information of a concern to the general public as a private citizen but rather reported misconduct pursuant to her official duties as a police officer. Defendants are entitled to summary judgment on Hunt's Fourth Claim for Relief.

## IV.  Violation of Right to Equal Protection - Violation of 42 U.S.C. § 1983

In her Fifth Claim for Relief, Hunt asserts that the City's retaliatory actions were based,

---

[7]Defendants' argument that this holding in *Fierro* has been overruled is rejected. The Second Circuit only noted that this was an issue of first impression in the courts and that, as a result, the defendants were entitled to qualified immunity. *Fierro v. City of New York*, 341 Fed. Appx. 696, (2nd Cir. 2009). The Second Circuit did not overrule, but rather acknowledged, the trial court's recognition of the existence of a "constitutionally protected right for public employees to refuse to follow orders to engage in misconduct." *Id.* at 698.

primarily, on her gender and that such actions violated her constitutional right to equal protection. Hunt relies on the City's alleged policy or custom of retaliating against women officers who report officer misconduct to support her equal protection claim. Defendants argue that Hunt is unable to establish that the retaliatory conduct was based, in any way, on her status as a female and, as such, is unable to support her claim based on a violation of her constitutional right to equal protection.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). In other words, all persons similarly situated should be treated alike. To establish a violation of the Equal Protection Clause, a plaintiff must show "that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class." *Serrano v. S.W. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *cert. denied*, 543 U.S. 825 (2004)(citing *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). "Intentional discrimination means that a defendant acted at least in part *because* of a plaintiff's protected status." Id. (citing *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994)(emphasis in original). Accordingly, to adequately support her Equal Protection claim and survive summary judgment, Hunt must establish that Defendants retaliatory acts were motivated by her protected status as a female.

Hunt concedes that she has no evidence that males who reported similar wrongdoing were not subjected to retaliation. She relies on evidence that Lewis, another female officer, was subject to retaliatory actions after she expressed concerns about racial profiling, gender discrimination, and restrictions on political speech by the Bureau, and that the Bureau had recently lost a disproportionate number of female probationary officers  The court finds that this evidence is

Page 51 - OPINION AND ORDER                                    {SIB}

insufficient to establish that Defendants intentionally retaliated against Hunt because of her gender.

First, there is no direct evidence that the retaliatory acts were based on Hunt's gender. Hunt did not report the alleged sexually hostile environment created by Officer Ho and there is no evidence that any of the Individual Defendants based any of their conduct on Hunt's status as a female. The fact that Officer Hubner or Officer Schilling expressed concern that they were losing a disproportionate number of females at the Northeast Precinct is a general statement not linked to Hunt's situation in any way.

Second, in the absence of evidence establishing why a disproportionate number of women were leaving the Bureau, Hunt is unable to tie this statistical evidence to her allegation that the Bureau had a policy of retaliating against female whistleblowers. The mere fact that women left the Bureau, without more, is not evidence that supports Hunt's Equal Protection claim.

Finally, to establish the required discriminatory intent behind the retaliatory conduct, Hunt must show that similarly situated males were not retaliated against. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Hunt concedes that she is not able to do this. She admits that the limited discovery afforded her in this case "shows that no male recruits made complaints of misconduct nearly as egregious as Hunt." (Pl.'s Resp. to Mot. for Summ. J. at 33.) In the absence of such evidence, Hunt is unable to meet her burden that she was denied her right to equal protection.

The court finds that, based on the evidence currently before it, Hunt has failed to establish that the retaliatory conduct she suffered was in any way related to her status as a female. Defendants are entitled to summary judgment on Hunt's Fifth Claim for Relief for violation of her right to equal protection.

/ / / / /

Page 52 - OPINION AND ORDER                                                                 {SIB}

## *Conclusion*

Defendants' motion (#63) for summary judgment is GRANTED with regard to Hunt's Second, Fourth, and Fifth Claims for Relief for gender discrimination, freedom of speech, and equal protection, and is DENIED on Hunt's First and Third Claims for Relief for retaliation under OR. REV. STAT. 659A.203 and 659A.230.

DATED this 15th day of April, 2010.

JOHN V. ACOSTA
United States Magistrate Judge

*{SIB}*